1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   NAVILLUS CONTRACTING,

4               Plaintiff,

5         v.                              12 CV 1895 (ALC)

6   LOCAL46 METALLIC LATHERS UNION
    and REINFORCING IRON WORKERS,
7
                Defendants.
8
    ------------------------------x
9                                        New York, N.Y.
                                         March 16, 2012
10                                       9:40 a.m.

11  Before:

12                  HON. ANDREW L. CARTER,

13                                       District Judge

14                    APPEARANCES

15  PAUL HASTINGS LLP (NY)
         Attorneys for Plaintiff Navillus
16  BY:  ZACHARY D. FASMAN
    RACHEL SANTORO
17
    KENNEDY JENNIK & MURRAY P.C.
18       Attorneys for Defendants Local 46
    BY:  THOMAS M. KENNEDY
19  SUSAN JENNIK

20

21

22

23

24

25

1        (Case called)

2        THE COURT:  Please be seated.

3        MR. FASMAN:  Good morning.  My name is Zachary Fasman,

4    from the law firm of Paul Hastings, for the plaintiff in this

5    case.  Rachel Santoro from my office is joining me as counsel.

6        THE COURT:  Good morning.

7        MR. KENNEDY:  Good morning, your Honor.

8        Tom Kennedy and Susan Jennik from Kennedy, Jennik &

9    Murray, attorneys for Local 46.

10       THE COURT:  Okay.  Good morning.

11       Okay.  I've received the parties' submissions.  Let me

12   just get a sense of where we are in the context of this

13   dispute.  Has there been a date set for arbitration yet?

14       MR. FASMAN:  There has not, your Honor.  Mr. Kennedy

15   and I just talked about this last night.  The Trade Board did

16   deadlock yesterday.  That's where this was going.  We were

17   talking about arbitrators out in the hallway right before the

18   hearing, so we don't have a date for that yet.

19       THE COURT:  When do the parties anticipate they'd be

20   able to straighten that out?

21       MR. FASMAN:  That all depends on whether we can agree

22   upon on arbitrator and when the arbitrator has a date but we

23   try to do that expeditiously and I am sure the union would do

24   it expeditiously too.

25       THE COURT:  Thank you.

C3GAANAVO                    Order to Show Cause

1          MR. KENNEDY:  Your Honor, I wanted to note that

2     there's actually a written decision from the Trade Board that

3     we regard as material to the outcome of this injunction

4     proceeding this morning.  I'd like to hand it up.

5          THE COURT:  That's fine.  I assume counsel for the

6     plaintiff has a copy of that as well.

7          MR. FASMAN:  I have several and I was going to do the

8     same thing as well.

9          THE COURT:  Okay.  Have a seat.  I need a moment to

10    review this.

11         (Pause)

12         THE COURT:  Okay.  Thank you.  All right.  Let me find

13    out from the parties just to confirm a few things.  So the

14    status of the work that is going on at the World Trade Center

15    cite, is not going on at the World Trade Center site is from my

16    understanding, Local 46 is installing currently rebar that's

17    being delivered to the actual site of the World Trade Center

18    but Local 46 is not participating in the shaping of the rebar

19    off site; is that correct?

20         MR. FASMAN:  I think that's essentially correct, your

21    Honor.  What is happening right now is that for the past

22    several weeks we have been able to continue working on the job

23    with straight rebar, in other words, the stuff that isn't bent

24    and we have been building the facility with straight rebar.

25    Our ability to continue to function that way is going to go

C3GAANAVO                    Order to Show Cause

1    away.  We're installing, essentially, all we can install is the

2    straight stuff.

3           The bent material to the extent that it was prior

4    bending, that stuff has either been installed or is available

5    to be installed.  We also have a truckload of rebar that was

6    bent in New Jersey that's been sitting on the site and that

7    hasn't been done.  So that is the status of the dispute is that

8    we have essentially not bent for some period of time and we are

9    going to run out of, at some point you've got to stop with the

10   straight stuff and you've got to install the bent rebar.  So

11   that's about where we are.

12          The work -- we did technically misstate that all the

13   work has stopped.  It hasn't.  We have been fortunate that we

14   have had straight rebar that hasn't been bent.

15          THE COURT:  Okay.  Thank you.

16          MR. KENNEDY:  That's -- I appreciate the admission by

17   counsel.  It would be a very different case had all the work

18   stopped at the site.  The Local 46 represented employees on the

19   site are performing all of the work they've been asked to do

20   and they are ready, willing and able to bend rebar on the site.

21   The Trade Board decision, as your Honor just undoubtedly

22   observed at page three, reads quote, the board unanimously

23   agreed -- this is yesterday -- that the installation of rebar

24   bent on-site should proceed uninterpreted.  Local 46 is in

25   support of that.  Bending at the site occurred beginning in

1    January and occurred through the end of February.  There's no

2    reason why it can't resume.  The employer may have an interest

3    in doing this elsewhere and we can arbitrate whether it wants

4    to but there's no pressing need to enjoin Local 46 because we

5    can go back to the status quo -- which is the material was

6    being bent on the site.

7             THE COURT:  Let me hear from plaintiff counsel as to

8    why it's plaintiff's position that the material should not be

9    bent on-site.  I understand that there's some safety concerns

10   that you laid out regarding carbon monoxide and space.  I guess

11   the space issue, my understanding, and correct me if I am

12   wrong, is that the space -- well, let me not say that.  Let me

13   find out from you what's the space issue here.

14             MR. FASMAN:  Well, your Honor, if you look at

15   Mr. Smith's affidavit and the photos that are on Mr. Smith's

16   affidavit, you'll see it.  This is a very tight construction

17   site right now.  There are a number of contractors on the site.

18   There's rebar lying all over the place.  There are machines all

19   over the place.  These contractors are in essence one on top of

20   the other and it's been our position and continues to be our

21   position that the machine that's there with the carbon monoxide

22   problems with the -- I don't want to say this in the wrong way

23   and confess to an OSHA violation -- but the shielding is not,

24   perhaps, what we would want it to be and we're concerned that

25   there are some real safety issues there with regard to

1    continuing to bend on-site.

2         And I think it's somewhat disingenuous of Mr. Kennedy

3    to say, well, we go back to the status quo.  The status quo was

4    we assigned people from Local 46 to come out to our facility,

5    as we're entitled to do under the contract, and work and handle

6    this and bend it in Sayreville and deliver it to the site.

7    That would have been the status quo but for the fact that the

8    union said, well, you are not going to Sayreville and we are

9    not going to install anything on-site

10        THE COURT:  OK.  And my understanding is that the

11   robotic equipment that is used to bend the rebar in Sayreville

12   is different than the equipment that's on-site and that the

13   equipment in Sayreville would use two workers as opposed to

14   three; is that correct?

15        MR. FASMAN:  Well, we've assigned two to it and that's

16   exactly right but we would be, if the union would supply men to

17   work there, we'll be happy to put three on until the

18   Arbitration Board meets -- until the arbitration is resolved.

19   We're not interested in going away from that and it's a

20   different type of machinery but it's much, much safer.  It's

21   much cleaner.  It's in a big not in enclosed space.  It doesn't

22   operate.  And I am going to say something that I don't know

23   enough about but it's not gasoline engines operating within an

24   enclosed facility.  This particular vehicle site as it goes up

25   is going to be a large garage where buses will park and you are

1    going to have to do this in increasingly enclosed spaces and we

2    have been concerned about it.  And there are several other

3    contractors who because of those same concerns are bending

4    off-site.

5              THE COURT:  Thank you.  Why don't we do this.  Let's

6    just step in the robing room and have some conversations.

7              MR. FASMAN:  Certainly, your Honor.

8              (Recess)

9              THE COURT:  Okay.  I have had off the record

10   conversations with each side separately to see if there's a way

11   we can resolve this matter.  It doesn't appear that there is

12   without dealing with the issue of the requests for the

13   temporary restraining order and preliminary injunction.  Let me

14   ask a few more questions of the parties.

15             Let me find out plaintiff's position on why plaintiff

16   believes it's allowed to have the bending of the rebar take

17   place off-site.  Tell me the Collective Bargaining Agreement.

18             MR. FASMAN:  I think the Collective Bargaining

19   Agreement does say that rebar shall be bent on-site.  On the

20   other hand, if there were a safety concern the parties could,

21   certainly, agree that it be bent off-site, that it's being done

22   at other sites in the World Trade Center.  One of the things

23   about Labor Law is that there is a law of the shop where

24   there's a problem and this is what we would argue to the

25   arbitrator.  If there was a problem past practice and how the

1    parties operate would definitely be involved.

2          But I want to make clear, your Honor, that the notion

3    that the Collective Bargaining Agreement says there should be

4    no bending off-site period is really asking your Honor to rule

5    on the merits of the dispute -- We think that that language is

6    susceptible exceptions for safety concerns and things along

7    those lines.  The union, a dozen or at least a dozen in this

8    case, we have our arguments about this.  They have their

9    arguments about this.  And what we're in essence saying is that

10   the Collective Bargaining Agreement says this.  That's all it

11   says and that's the end of this case.  I don't think that's

12   true.  And I think that we have the right to argue to an

13   arbitrator that there have been exceptions.  There's a real

14   safety concern here and that this is one of those situations

15   that this should be bent off-site despite the language of the

16   contract.

17         THE COURT:  One of the things that I need to decide is

18   whether or not this job action or inaction on the part of the

19   defendants violates a no-strike clause or similar clause in the

20   Collective Bargaining Agreement.  And it appears that

21   essentially defendants' argument is, I guess, they haven't

22   quite phrased it this way, is that by taking this inaction they

23   are not violating a no-strike clause in the Collective

24   Bargaining Agreement but they are, essentially, trying to keep

25   plaintiff from violating the Collective Bargaining Agreement.

1      MR. FASMAN:  Well, your Honor, as the employer we have

2    the right to make work assignments and to the extend that they

3    are not followed that's a strike in violation of the contract.

4    As to whether they can -- the problem is even the way you

5    phrased it, your Honor, is they're taking matters into their

6    other own hands.  They're saying, look, this contract says

7    there should be no off-site bending, no exception.  We don't

8    agree with that.  There's off site bending going on at the

9    World Trade Center site right now.  There is no question that

10   that's the case.  Other contractors are doing this.  And for

11   them to say, well, this contract has never allowed off-site

12   bending.  That's not true.

13      But more to the point it's not an excuse when we say

14   we have the right to assign the men.  We went your men to go to

15   New Jersey, bend off-site, they say you don't have that right.

16   That's what's being arbitrated.  And they don't get the right

17   to say oh, well, wait a second.  We don't agree that you have

18   that right and we are not going to go to New Jersey.  We're not

19   going to allow our men to go there pursuant to your work order

20   and we're not going to install anything that you bend off-site.

21   In essence, whether or not they have the right to do that or

22   not, whether or not we have the right to assign them or not is

23   what goes to the arbitration.  So it's really an argument that

24   you prejudge the arbitration and decide what the arbitrator

25   will decide.  Whether we're right or wrong in making these work

1    assignments will be arbitrated.

2            THE COURT:  I am certainly not here to decide that

3    ultimate issue but I have to consider whether or not this

4    action violates that no-strike clause in the Collective

5    Bargaining Agreement and then once we get through those Boyce

6    Market factors I have to get to the ultimate factors of an

7    injunction or a temporary restraining order generally in terms

8    of irreparable harm and likelihood of success on the merits.  I

9    still have to look at those issues.

10            So your position is that -- I guess, what about the

11   notion that the parties have entered into this Collective

12   Bargaining Agreement and that Collective Bargaining Agreement,

13   certainly, the Boyce Market seems to suggest strongly, if not

14   out right say, that the parties should be held to that

15   Collective Bargaining Agreement, the whole reason, rationale

16   behind Boyce Market was, okay, you can enjoin, a court can

17   enjoin a labor union from striking because that labor union

18   collectively bargained and had this no-strike clause in there

19   so they should be held to that bargain in spite of the other

20   legislation that was passed by Congress.  Why wouldn't the

21   opposite apply here that the parties have collectively

22   bargained this?  And if the parties wanted to put in exceptions

23   that, certainly, could have been done in the Collective

24   Bargaining Agreement.

25            MR. FASMAN:  Well, no question that's true, your

1    Honor.  But remember that's the issue that's going to be

2    arbitrated.  That's the issue that the Trade Board deadlocked

3    on.  I mean, the Trade Board basically said, well, you know as

4    to off-site bending we, you know, it was two to two, this

5    should be resolved in arbitration.  We think we have the right

6    to make these arbitrations off-site.  The union doesn't.

7    That's the horse race.  That's where we're going with

8    arbitration but the union doesn't have the right.  There are

9    two no-strike clauses, not just one.

10         There is one on page 11 where I says, the union shall

11   note order a strike or stoppage of work, nor shall they

12   collectively leave the work of the employer pending the

13   adjustment of these disputes.  On page 13 under the Trade Board

14   section the contract says, it is mutually agreed that there

15   should be no cessation of any work in connection in which there

16   may be a complaint or charge but that all such work shall

17   regularly proceed pending the decision of the Trade Board or

18   executive, blah, blah, blah.

19         That's very clear.  They stopped doing the work.  They

20   have work walked off.  The union has ordered our employees,

21   members of the union, not to work in Sayreville and not to go

22   back to Sayreville.  And we've got one truckload of rebar

23   sitting on the ground which we can't install and this is going

24   to go on like this pending the arbitration of this issue.

25         THE COURT:  In terms of the way that you are

1    encapsulating this issue if this situation were different or

2    let's say it is the same factual scenario that we find

3    ourselves in and if defendant came to court first as the

4    petitioner and petitioned and said that the current plaintiff,

5    that you should not be allowed to bend work off-site because of

6    this Collective Bargaining Agreement that they'd be totally

7    entitled to request that preliminary injunction, that temporary

8    restraining order and that I should issue that.

9              MR. FASMAN:  No, because they don't have that right.

10   They would get that right.  The reason we're here is because of

11   the work stoppage.  That's what brings us here.  The reverse

12   Boyce Market doesn't work the same way.  If they think that we

13   should not bend off-site they have the opportunity to go

14   through the grievance and arbitration procedure and to proceed

15   in that exact way.  There are very few reverse Boyce Markets

16   against employers and for that same reason.

17              Plus, in this situation, judge, there is no

18   irreparable harm.  We have to do this project.  We have to

19   install this stuff.  The World Trade Center site has to go on.

20   This is the first building.  Every truck is going to have to

21   pass through this building.  My friends at the table behind me,

22   we're willing to pay everyone.  We're willing to employ them in

23   a completely different, in a completely different environment

24   that's much safer.  We're willing to pay them wages.  I mean

25   this is no harm/no foul to them.

1    THE COURT:  OK.  So let me hear more from you as to

2    the irreparable harm to you.

3    MR. FASMAN:  Well, your Honor, we have as to

4    irreparable harm as I believe I indicated, we have eight

5    thousand tons of rebar to install, five thousand tons of which

6    have to be bent.  The union says, well, we've bent 46 tons.  It

7    isn't going to get us very far in this situation.  We have a

8    contract that has very tight deadlines in it.  The entire

9    project as I understand it is already five months behind

10   schedule and we have a contract that's also subject to

11   acceleration.  This is really the first building.  This one has

12   to be built to let other trucks and other buses get in.  So we

13   have penalty clauses and we need to install this stuff and we

14   need to install it now and we need to do it in a most

15   expeditious way possible with minimal safety risks to the

16   employees.

17        It is not like we're asking the employees it to go

18   over to Sayreville and bend it by hand.  We're asking them to

19   come operate machinery that is much safer than what they're

20   operating right now and to help us.  It's their work.  We have

21   no question.  It's their work.  They are entitled to bend the

22   rebar.  We have no problem with this.  But we think the union's

23   unilateral decision to say, you are not going to Sayreville.

24   We are not operating this off-site.  It is clearly a strike in

25   violation of the contract and it puts us really behind the

1    eight ball in terms of completing the project and doing this in

2    a proper way, to say nothing of the safety concerns.

3            THE COURT:  You indicated that the project is about

4    five months behind schedule and I gather that, if anything, you

5    might be able to attribute three days of that to this situation

6    of that delay.

7            MR. FASMAN:  I meant to say and I hope I didn't

8    misstate.  I think it's the whole project, the whole WTC site.

9    There are many, many different things being built there.  So,

10   as usual in a project of this size it's way behind schedule.

11   And we're under pressure because of that.  I am not talking

12   about three days or whatever is going on between the parties

13   here.  It's not, certainly, attributable to that, the five

14   months behind.  There are tons and tons of projects going on.

15   But at the same time, as you said, we have acceleration clauses

16   in the project and this is the keystone building.  You've got

17   to go through this in order to get to the other side.  So we

18   have to stick here.  We also have liquidated damages clauses,

19   penalty clauses throughout our contract.

20           THE COURT:  You indicated that in terms of the

21   installation of the straight steel bars that's almost completed

22   and again both sides have indicated that there is a truck with

23   rebar that was bent in New Jersey that's on-site and

24   defendant's have indicated in their submissions that they're

25   willing to bend that on the site.  How long would that take for

1    that action to take place?

2            MR. FASMAN:  I don't think they would bend it on-site.

3            THE COURT:  Not bend but to install it on-site?

4            MR. FASMAN:  I don't know.  Not very long.  I mean the

5    one truckload isn't going to get us very far.  The problem is I

6    don't know how many tons are in there but it's a minimal

7    amount.  We'd be out of work by the middle of next week even if

8    we installed that one truck at the latest, the end of next

9    week.  And we have got to proceed on this job.  That's really

10   why we're here.  We need to get going on this.  And as I say,

11   if we're wrong and the arbitrator finds that we're wrong and

12   finds that the work should have been on-site, the arbitrator is

13   able to issue whatever remedy that the arbitrator can issue.

14   And if we have to do it the other way we'll do it the other way

15   but we think we can do it off-site.  We think that's consistent

16   with the contract and, certainly, half of the Trade Board

17   thought that we were right on that.  And I think we're able to

18   go forward with that.

19           THE COURT:  I understand the parties haven't picked an

20   arbitrator yet but it doesn't appear that this arbitration

21   process once it starts would take very long.  Do you agree with

22   that?

23           MR. FASMAN:  We will be happy to do it as quickly as

24   possible.  This may be a one day hearing.  We've got a few

25   witnesses about these issues, safety directors, folks like

1    that.  I have no idea what the union would bring forward in

2    terms of their proof but it doesn't sound like more than a day

3    or a day and a half hearing.  Of course, arbitrators you can

4    request that they issue a prompt decision.  You can't always

5    demand it.

6            THE COURT:  All right.  Thank you.  I want to hear

7    from defense counsel as to the plaintiff's claim of irreparable

8    harm.

9            MR. KENNEDY:  We thought it was telling that 98

10   percent of the response on irreparable harm was economic.  That

11   there's five thousand tons to install.  They've only done 46

12   on-site but there's 15 tons, I am told, on the truck.  But in

13   order to get this project back on time they've got to bend it

14   on off-site.

15           There was hardly a word about safety in that whole

16   presentation.  There is no irreparable harm in connection with

17   safety.  Regardless this is the same site it's like every other

18   site in the City of New York, nothing special or unique about

19   it.  The union, in our view, would be irreparably harmed by

20   having its contract violated.  Even if our men are sent to New

21   Jersey and paid it is still against the square language of the

22   contract and it is true that the parties have a disagreement

23   about that.  And essentially the disagreement being whether

24   that bold language has an exception for safety and if it does

25   they can prove some safety related issues.

1      Now, they'll have an opportunity to do that in front

2  of an arbitrator.  We will proceed to that very quickly.  If

3  they win, they win.  But the issue today is, are they entitled

4  to an injunction which would require the union to do something

5  against its contract in the interim between today's hearing and

6  when that arbitration was concluded and we suggest to you there

7  is no basis for doing that.  They haven't demonstrated a

8  likelihood of success.  I've certainly seen arbitrations where

9  people take usually for economic reasons somewhat strange

10  interpretations of the contract.  I don't think it's a million

11  to one shot that they can win this.  There is, certainly, no

12  likelihood of success here and the clarity of the contract

13  which says that all rebar will be cut and bent on-site.

14      The Collective Bargaining Agreement does have two

15  references to not striking and I think that's the significance

16  because the second one on page 13 provides that any limit or

17  cessation of work is only until there is a Trade Board

18  decision.  There is a Trade Board decision in this case.  It's

19  true they deadlocked on the question of whether work should be

20  bent off-site but they agreed that the work should proceed and

21  be bent on-site.  So there's a remedy in effect that's already

22  been given us by the Trade Board that while the question of

23  off-site work is being arbitrated in that interim, the union is

24  directed and required and wants to bend and cut we rebar is

25  necessary on the site.

1      It's important I think for us to realize who is not

2  here today.  The actual contractor, as was seen in the papers,

3  is PMC.  PMC is the group to which Navillus subcontracted the

4  job of cutting bending and installing rebar at the site.  Are

5  not here today.  They haven't taken the position that it's

6  unsafe to perform the work that they agreed to do on the site.

7  The owner has not submitted anything.  The Port Authority is

8  suggesting there's something unsafe about the building

9  operations.  The manager to the site, Tishman, has not

10 presented anything suggesting it's unsafe.  And, in fact, our

11 understanding of each of those entities is that they do regard

12 it as safe and this an economically safe application by the

13 plaintiffs.

14     For this to be granted would authorize an employer to

15 get around that by simply seeking an injunction with the

16 argument that the union hasn't agreed to violate its contract

17 as your Honor phrased it and, therefore, they should be

18 required to violate their contract until the employer's claim

19 is arbitrated.  It simply doesn't work that way.

20     The standards under Boyce Market are specific and

21 clear.  The employer has, I don't think, made a showing that

22 meets any of them and we would ask that the injunction be

23 denied.

24     The original application was -- had to be, we think,

25 supported very substantially, that there was a safety issue.

1    It wasn't.  No showing of anything unsafe.  No showing that

2    anyone was injured.  No showing that there were chains.  No

3    showing of any OSHA violations.  No showing of any actual,

4    concrete, specific safety violations on-site.  And in the

5    absence of that we would submit that they have simply failed to

6    support the issuance of an injunction.  On top of that we do

7    have now as I've said -- and I apologize for repeating

8    myself -- the decision by the Trade Board that "The board

9    unanimously agreed that the installation of rebar bent on-site

10   should proceed uninterrupted."  That's what we wanted.  That's

11   what we got.  We think that makes an injunction inappropriate.

12          THE COURT:  Thank you.  Let me hear from the plaintiff

13   on anything.

14          MR. FASMAN:  Well, your Honor, we have Mr. Smith here

15   and can talk about what we know from Tishman, what position

16   they've taken, what the Port Authority would say.  And these

17   are -- we haven't put this in our papers because, obviously,

18   that's the merits of the case.  But I mean we have serious

19   safety concerns.  The Port Authority shares those concerns.

20   Tishman shares those concerns.  That's what we are going to

21   present in the arbitration but if your Honor wants to hear

22   them, Mr. Smith is more than willing to get on the witness

23   stand and talk about the safety concerns, where this safety

24   report that's attached to his affidavit came from.  The union

25   says that's sham.  It was created on March 12.  It goes back a

1   long, long way.  We have been worried about this the whole

2   time.  There are serious safety concerns here and we have

3   talked about this with Tishman, with the Port Authority, with

4   TMC.  They all agreed that there are safety concerns here and

5   we are willing to present testimony to that effect if your

6   Honor wishes.

7          As to likelihood of success on the merits, it's

8   likelihood of success showing there's on the Boyce Markets that

9   there is an arbitral agreement that it should be submitted to

10  arbitration and that there is irreparable harm.  I mean, what

11  Mr. Kennedy is saying is, judge, we want you to prejudge the

12  merits and by the way we don't think their case on merits is

13  very good.  That's not the job of a court faced with a Boyce

14  Markets injunction.  That's asking the Court to say, well, I

15  don't agreement.  I don't think this is much of a grievance,

16  therefore, the injunction is denied.  That's -- the whole game

17  is this should go ton to an arbitrator.  There is no no-strike

18  clause.  The union's admitted that they pulled the men off the

19  job in Sayreville.  The union's admitted that they told their

20  men that you are not to install rebar that's been off-site.

21  That's enough on the Boyce Market.  What Mr. Kennedy wants you

22  to do is to say, I don't agree with their interpretation of the

23  contract but that's why we're going to arbitration and that's

24  something that is not part of a normal Boyce Market inquiry.

25          THE COURT:  Okay.  So can you tell me a little bit

1   more in terms of the irreparable harm.  Can you spell out for

2   me in terms of these timelines under the contract and how

3   exactly these timelines will be affected in the short term

4   because I understand both parties have, certainly, an interest

5   it dealing with this as expeditiously as possible.

6           MR. FASMAN:  Your Honor, if I might, I'd ask Mr. Smith

7   to do that.  He knows better than I do.  He is the general

8   foreman on our site.  They are dealing with the whole site and

9   he can present chapter and verse on that.  I don't know that I

10  could go into it as well as he can.

11          THE COURT:  Okay.  That's fine.  Let's go ahead and

12  swear him and have him testify.

13   KEVIN SMITH,

14       called as a witness by the Plaintiff,

15       having been duly sworn, testified as follows:

16  DIRECT EXAMINATION

17  BY MR. FASMAN:

18  Q.  Mr. Smith, by whom are you employed, sir?

19  A.  Navillus Contracting.

20  Q.  What is your job?

21  A.  My job title is Project Manager for the World Trade Center

22  Vehicle Security Center.

23  Q.  What's entailed in that job, sir?

24  A.  I am in charge of managing the project financially,

25  schedule manpower material.

C3GAANAVO                    Smith - Direct

1        MR. FASMAN:  Your Honor, may I show the witness his

2   affidavit and enter that into --

3        THE COURT:  Yes.

4        (Pause)

5        THE COURT:  Defense counsel has a copy of that, right?

6        MR. KENNEDY:  I do, your Honor.

7        MR. FASMAN:  Trying to make sure I have a copy as

8   well, your Honor.

9   BY MR. FASMAN:

10  Q.  Mr. Smith, do you recognize this document?

11  A.  I do.

12  Q.  Is your suggest on that document, sir?

13  A.  It is.

14  Q.  Is this true and accurate to the best of your knowledge,

15  sir?

16  A.  Yes.

17  Q.  Let me ask you just a few questions to respond to the

18  judge's inquiries as to the time deadlines, the nature of the

19  contract that Navillus has for this and the need for speed.

20  First of all, tell us what -- there is a contract that Navillus

21  holds for this building, correct?

22  A.  There is.

23  Q.  And with whom is that contract?

24  A.  We have a contract with the Port Authority of New York and

25  New Jersey.

1   Q.  And does that contract contain timetables?

2   A.  It does.

3   Q.  Tell us what those timetables are if you can?

4   A.  The timetables require us to finish phase, turnover

5   phrased, completion of the project.  Those timelines are, I

6   believe, the fourth quarter of 2012 for a time completion and

7   beginning of the third quarter of 2012 for the beginning of

8   phase one which is about the first 60 percent of the project.

9   Q.  Okay.  And where are you now in terms of the work being

10  perform, on time, behind?

11  A.  Approximately, five months behind that timeline.

12  Q.  Okay.  And why is that, sir?

13  A.  It has to do with getting the project started factors that

14  are outside of Navillus' control for the most part.

15  Q.  Is the contract subject to acceleration?

16  A.  It is.

17  Q.  What does that mean?

18  A.  That means that we will be forced to complete the project

19  on time or as close to on time.  What will be required to do is

20  dramatically increase our manpower work, a lot of overtime to

21  bring the project in as close to the timeline as possible.

22  Q.  Are there any contractual penalties if you don't do that?

23  A.  There are.

24  Q.  Tell us what those are, sir?

25  A.  I'm not sure of the exact quantity of amount of liquidated

1   damages but the liquidated damages are actually stated to begin

2   at the contractual date and it's the phase turnover to us by

3   the steel contractor, it says the overall timeline is the

4   requirement for the liquidated damages.  It doesn't matter when

5   we turn the steel over to us.  When they turn the structure

6   over to us the controlling thing is when we complete it, so the

7   way the contract is written it doesn't matter if they delayed

8   us, we still have to complete at the date.

9   Q.  Did they, in fact, delay you?

10  A.  They have.

11  Q.  Okay.  All right.  Can you tell us what the building

12  configuration is that you are building?  What is the vehicle

13  center, vehicle security center going to look like when it's

14  done?

15  A.  It's going to be essentially an armored parking garage.

16  Buses and trucks will come in on one end down a ramp.  They

17  will also be put through a screening process where they'll be

18  x-rayed and checked for security.  They will then proceed down

19  to another level where there will be parking and also tunnels

20  that bring them out the entire World Trade Center complex.

21  Q.  Is this all below ground structure?

22  A.  For the most part 90 percent of the structure is below

23  ground.

24  Q.  Okay.  Let me direct your attention to the Paragraph Eight,

25  I believe, of your affidavit which talks about a safety survey.

1    Why don't you take a moment and read that, sir.

2            (Pause)

3    Q.   Have you read that, sir?

4    A.   I have.

5    Q.   Did you have any role in preparing this survey?

6    A.   I did.

7    Q.   What's your role, sir?

8    A.   I participated with your Safety Director Patrick Mills in

9    preparing this.

10   Q.   To the best of your knowledge, when did you or the safety

11   director begin preparing that survey?

12   A.   We have been looking into safety issues related to rebar

13   bending since we started on-site in January.

14   Q.   What prompted you to do that?

15   A.   We are continually focused on safety.  We have safety

16   audits, our own personal every week.  We do it, our foremen do

17   a daily check list of their spaces.  That's a major focus of

18   ours.

19   Q.   And was there anything specific that prompted this when the

20   job began, any specific concerns about safety?

21   A.   The job's somewhat unique and that there is very little

22   space.  In fact, at this moment we have no way to lower rebar

23   into the site except through some very minor holes in the deck.

24   The logistics of the site are very difficult, very challenging

25   and there is very, very little room to work.  Normally on a job

1    like this you'd have an awful lot more space and an awful lot

2    more access to the job.

3    Q.  Is that because most jobs are above ground?

4    A.  That is part of it.  The only other thing is just the

5    configuration of the job with the World Trade Center, the 9/11

6    memorial's immediately adjacent to us, so we have immediate

7    safety concerns.  Residential buildings in the areas.  Just the

8    configuration of traffic in and out of the site is very

9    challenging.

10   Q.  Are you familiar with the safety report that is Exhibit B

11   to your affidavit, sir?

12   A.  Yes.

13   Q.  And did you have any role in preparing it?

14   A.  Yes, I did.

15   Q.  And when, to the best of your knowledge, when was this

16   prepared?

17   A.  Within the last week.

18   Q.  Why was it prepared within the last week?

19   A.  This was prepared in support of our case here.

20   Q.  Are there any other documents dealing with safety issues

21   from this site?

22   A.  We would have safety reports, foremen's daily reports.  We

23   have a whole range of documents related to safety.

24   Q.  Now, with regard to the safety concerns that are outlined

25   in this report in Exhibit B, the union has said that that's a

1   sham designed to cover-up an economic motive to have this done

2   elsewhere.  In your view is that true or not true?

3   A.  It's not true.

4   Q.  Why do you say that, sir?

5   A.  Because there is a genuine safety concern.  The concern is

6   not just in the bending of rebar.  It's the material handling.

7   Every time you pick something up you have an inherent risk in

8   doing that.  By bending on-site you at least double the amount

9   of picks and carries that you have to deal with in this

10  material.  So it's definitely a safety concern.

11  Q.  When with you say "picks and carries" what do you mean by

12  that?

13  A.  We get rebar into site and, approximately, five thousand

14  pounds bundles.  Those have been to be moved through the site

15  to the bending area.  We never are able -- we will not be able

16  to maintain a steady bending area so we won't be able to

17  establish good logistics links there.  So we'll have machinery

18  tracking back and forth, fork lifts, trains, moving this

19  material from one location on-site to another to another

20  sometimes through multiple levels where it has to get dropped

21  through a hole in the deck to the next level, then picked and

22  carried to the bending place, then from there moved to the pick

23  hole again lifted, carried across and brought back to the

24  installation place.

25  Q.  What, if any, advantages in this process would there be to

1  having the rebar bent off-site in New Jersey?

2  A.  The material would have only have to be moved from the

3  truck to the installation site rather than being moved from the

4  truck to the bending yard, then to the installation sites.  So

5  you have the amount of moves on the site.

6  Q.  We have been, during our argument we talked about the one

7  truck that has bent rebar on it on-site.  Do you know how many

8  tons are in that?

9  A.  I believe the total truck I believe 20 something tons, 22

10  tons.  The bent material I believe was, approximately, 15 tons.

11  Q.  How many tons, just for the record under oath, how many

12  tons of rebar will have to be installed in the VIC?

13  A.  Approximately a thousand.

14  Q.  How many tons of that will have to be bent?

15  A.  Approximately, five thousand.  Excuse me.  Approximately,

16  60 percent.

17  Q.  There was some notion of other entities involved with the

18  site not having safety concerns Tishman and Port Authority of

19  New York?

20  A.  Tishman is the construction manager.

21  Q.  And do you have feelings with them?

22  A.  Yes.  Tishman manages us for the Port Authority.

23  Q.  Have you discussed safety concerns?

24       MR. KENNEDY:  Objection, your Honor.  This would be

25  plain hearsay.  The point I had made earlier is if the petition

C3GAANAVO                    Smith - Direct

1    is supported by evidence from these entities demonstrating any

2    safety concerns they have, that was --

3              THE COURT:  Objection sustained.  Rephrase the

4    question.

5              MR. FASMAN:  Yes, I will, your Honor.

6    BY MR. FASMAN:

7    Q.  Do you know, if without telling us, do you know if any

8    other entities involved in World Trade Center site on this

9    project have safety concerns about this particular process?

10             MR. KENNEDY:  Objection.

11             THE COURT:  Sustained.

12   BY MR. FASMAN:

13   Q.  Have you ever -- let's strike that.

14             Can you tell us what the impact has been of the

15   union's refusal to continue to allow its members to bend it at

16   Sayreville?  Has that had an impact on Navillus' business?

17   A.  Yes.

18   Q.  Can you tell us what was it is?

19   A.  We've been unable to proceed with certain areas of the

20   project, primarily, a slab at television 253.

21   Q.  And what impact would it have if all the bending had to be

22   done on-site, that is if you couldn't go to Sayreville?

23   A.  I believe we would need probably bending operations

24   on-site.  It would be an awful lot of additional bar required

25   on-site to warehouse this while the bending was being done.

C3GAANAVO                    Smith - Direct

 1  This would take up an awful lot of space and it would be very
 2  slow.
 3  Q.  Do you know if other contractors at the World Trade Center
 4  site have been bending off-site?
 5  A.  I do.
 6  Q.  How do you know that, sir?
 7  A.  From talking to them.
 8          MR. KENNEDY:  Objection, your Honor.
 9          THE COURT:  Objection sustained.
10  BY MR. FASMAN:
11  Q.  Aside from talking to them do you know that this is
12  happening?
13  A.  I've seen trucks with bent rebar delivered to the site.
14  Q.  And without asking about your discussions with other
15  people, have there been discussions --
16  A.  Yes.
17  Q.  -- with Tishman and the Port Authority about safety?
18  A.  Yes.
19          MR. FASMAN:  All right I am not going to ask you what
20  those discussions were.  I'll tender the witness, your Honor.
21          THE COURT:  Okay.  Cross-examination?
22  CROSS-EXAMINATION
23  BY MR. KENNEDY:
24  Q.  Mr. Smith, my name is Tom Kennedy.  I am an attorney for
25  the union.

C3GAANAVO                    Smith - Cross

1          You have been with Navillus since 2008; is that

2    correct?

3    A.  2009.

4    Q.  2009.  You've a project manager since that time?

5    A.  I have.

6    Q.  When was Navillus awarded the super structure of concrete

7    contract for the vehicle safety center?

8    A.  I believe it was July of this year of last year.  Excuse

9    me.

10   Q.  July of 2011?

11   A.  That's correct.

12   Q.  And that contract is valued at 76.5 million?

13   A.  Yes.

14   Q.  Was that the amount that Navillus bid for the right to

15   perform this work?

16   A.  Yes.

17   Q.  In structuring that bid did Navillus assume that Local 46

18   would represent the workers who performed the cutting, bending

19   and installation of steel rebar?

20   A.  Yes.

21   Q.  And isn't it a fact that at the time of the submission of

22   the bid for this work Navillus assumed that cutting and bending

23   of rebar would be done on-site?

24          MR. FASMAN:  Your Honor, I have no object.  There is

25   no evidence that this witness would know that.

C3GAANAVO                    Smith - Cross

1           THE COURT:  That's overruled.  You can answer.

2    A.  I am not the estimator.  That's not my job.

3    Q.  You don't know.  It's my understanding that Navillus,

4    actually, subcontracted the work of installing, cutting and

5    bending steel rebar to PMC Rebar; is that correct?

6    A.  That's correct.

7    Q.  And when was that done?

8    A.  January 2012.  I am not certain of that date.

9    Q.  All right.  That's your best estimate at this point?  Do

10   you know how much that contract is worth?

11   A.  It's a per pound contract since we don't know the exact

12   quantity of rebar but it's, approximately, $12 million.

13   Q.  Okay.  And the 12 million assumed that Local 46 would be

14   representing the folks that did the work?

15   A.  Correct.

16   Q.  And PMC Rebar after getting the contract installed a

17   cutting and bending machine at the work site, correct?

18   A.  They had brought a cutting and bending machine to the site,

19   yes.

20   Q.  And from, approximately, January 23, through the end of

21   February PMC Rebar performed cutting and bending work with

22   Local 46 labor at the site; isn't that also correct?

23   A.  That's correct.

24   Q.  Now, it's my understanding that Navillus has notified PMC

25   that they're taking part of the work away from them; is that

1    also correct?

2    A.   That's incorrect.

3    Q.   All right.  The scope of the work that PMC Rebar was given

4    was the right to cut, bend and install all of the rebar for the

5    project, correct?

6    A.   It's the installation of the rebar and associated work.

7    Q.   The associated work includes all the cutting and bending?

8    A.   That is correct, yes.

9    Q.   So if Navillus is performing the work of cutting and

10   bending in its Sayreville facility, would that be work that was

11   taken from PMC?

12   A.   That contractual, those contractual details are still under

13   negotiations.

14   Q.   So you at least notified PMC that Navillus wanted to

15   renegotiate the agreement and conduct its own cutting and

16   bending, correct?

17   A.   We are in discussions about exactly that, not taking the

18   work from them, perhaps, having their people do this work.

19   Q.   When did you notify PMC Rebar that you wanted to have this

20   work done off-site in Sayreville?

21   A.   They have been aware of it for nearly the entirety of the

22   discussions of the contract.

23   Q.   And so give me a time.  When would that apply?

24   A.   December/January.

25   Q.   So is it fair to say then that as of December 2011 going

C3GAANAVO                    Smith - Cross

1  forward, Navillus was considering having the cutting and

2  bending work done off-site at its Sayreville facility?

3  A.  Certainly, considering, yes.

4  Q.  Isn't it a fact that it wasn't until February 29, 2012 that

5  Navillus notified Local 46 that it was going to be performing

6  cutting and bending work off-site?

7  A.  Yes.

8  Q.  So that these discussions were going on for three months

9  before you notified the union?

10  A.  Yes.

11  Q.  And in December of 2011 the job site hadn't started yet,

12  correct?  At least the steel work hadn't started on the job

13  yet?

14  A.  That's right.

15  Q.  So would it be fair to say that as of December 2011 there

16  were no safety concerns at the project since it hadn't started

17  yet?

18  A.  We were aware of the logistical situation of the site at

19  that time and aware that there could possibly be safety issues.

20  Q.  Could possibly be safety issues.  Well, I assume that you

21  were aware of the logistical circumstance of the site at the

22  time you made the bid sometime in early 2011; isn't that also

23  true?

24  A.  No.

25  Q.  What is it that happened as of December 2011 that caused

1    you to be concerned about the safety of cutting and bending on

2    the site?

3    A.   The project had started and we could see the way the

4    project was developing.  As we were bidding a job and early on

5    we did not see that.  Once you, actually, see it taking shape

6    then you have a real handle on what's going on.

7    Q.   Has PMC refused to do the cutting or bending work that it

8    contracted to do at the BSC site?

9    A.   No.

10   Q.   They're still prepared and willing to go forward cutting

11   and bending the work on the BSC site, isn't that correct?

12   A.   I haven't had specific discussions with them about that.

13   Q.   Had they said anything that makes you believe that they're

14   not interested in fulfilling the contract they got in January?

15   A.   No.

16   Q.   When did Navillus purchase the cutting and bending machines

17   that it installed in Sayreville?

18   A.   January.

19   Q.   Of?

20   A.   2012.

21   Q.   Okay.  And is the Sayreville site one that's owned by

22   Navillus?

23   A.   No, it is not.

24   Q.   It's a rental site?

25   A.   It is.

1    Q.  How long a lease does Navillus have for the Sayreville

2    site?

3    A.  Two years.

4    Q.  When did the cutting and bending machines that you've

5    installed in Sayreville become operable?

6    A.  Late February.

7    Q.  Is it fair to say that as soon as the machines became

8    operable Navillus directed 46 employees to perform the cutting

9    and bending work in Sayreville?

10   A.  Yes.

11   Q.  Why was the union not notified of your intent to perform

12   BSC cutting and bending off-site work until the machines were

13   already installed and ready to operate?

14   A.  Didn't think it was necessary.

15   Q.  You didn't think it was necessary.  Okay.  I'd like to

16   direct your attention to your statement, particularly,

17   Paragraph Eight.

18   A.  Sure.

19   Q.  I believe counsel previously directed your attention to

20   that matter.  Now am I accurate in saying that Paragraph Eight

21   of your statement which has been put in the record is the part

22   of your statement where you identify the safety concerns that

23   Navillus is using as the reason for this decision to cut and

24   bend off-site?

25   A.  It's one of the paragraphs with the safety concerns I

1    listed.

2    Q.  Well, are there -- well, let's look at -- would it be fair

3    to say that Paragraphs Eight and nine are where the concerns

4    list are listed?  I don't mean it's not a trick question.  If I

5    am wrong just tell me.

6    A.  That I did memorize it but I believe that's right.

7    Q.  Okay.  And I assume like anyone, when you listed the safety

8    concerns you listed the one that was most important first?

9    A.  No.

10   Q.  You didn't?

11   A.  No.  I see we have carbon monoxide first and carbon

12   monoxide is a valid concern but handling the materials is our

13   primary concern.  And --

14   Q.  So it's just accidental that the first thing you listed was

15   that the carbon dioxide concern?

16             MR. FASMAN:  Your Honor, can the witness finish was

17   his answer before Mr. Kennedy --

18             MR. KENNEDY:  I thought he had.

19             THE COURT:  I think had he finished.  Had you finished

20   your answer before?

21   A.  No.  The material handling is our primary concern, along

22   with the poorly shielded machines that are customarily used.

23   Q.  All right.  I noticed that in the report you dated you

24   prepared dated March 13, 2012 for purposes of using in this

25   litigation doesn't include any reference to the carbon dioxide

C3GAANAVO                    Smith - Cross

1  concern, correct?

2          THE COURT:  Carbon "monoxide".

3          MR. KENNEDY:  Sorry.  Yes.

4  A.  Yes, there's carbon monoxide listed in Paragraph Eight.

5  Q.  No.  I am referring to the report that's attached as

6  Exhibit B.  I apologize if I misdirected you.  The exhibit to

7  your report.

8  A.  Oh, I am sorry.  No.  I believe this is focused on material

9  handling.

10 Q.  And the carbon monoxide concern arises because it's a gas

11 powered engine for the bending machine; is that correct?

12 A.  That's correct.

13 Q.  And the industry's been using gas powered engines, would

14 you say, for 50 years?

15 A.  I assume so, yes.

16 Q.  Okay.  So the material handling steps, if we could just

17 examine those for a second.  When you refer to material

18 handling steps, isn't it true that the same analysis about the

19 times that rebar has to be handled at a site is true for every

20 site in the City of New York, not just for the VFC site?

21 A.  No.

22 Q.  What is special about the VFC site for purposes of material

23 handling analysis?

24 A.  Most sites have much cleaner resistant paths -- would have

25 set back on a roof with bending an RD pick with a crane to that

C3GAANAVO                    Smith – Cross

1  location and pick from that to the floor where you are working.

2  There is no such clear paths.

3  Q.  All right.  In fact, I believe you indicated that the rebar

4  has to be lowered through certain openings, I guess, into the

5  belly of the development, correct?

6  A.  That's right.

7  Q.  Isn't that true whether the rebar is bent on-site or

8  brought in bent.  It still has to be lowered through those

9  openings that you identified?

10  A.  It does.

11  Q.  So that the existence of these opening through which rebar

12  has to be lowered really has nothing to do with whether rebar

13  is bent on-site or off-site, does it?

14  A.  No.  What I am saying, what the report says is that there

15  will be multiple steps where the bar will be brought in

16  straight, brought to a bending facility including all the steps

17  to get it there and then distributed from the bending facility

18  to the installation area.  If it were bent off-site it would be

19  just dropped from the truck into the building, delivered to the

20  installation area.  So a whole generation of moves is

21  eliminated.

22  Q.  You've analyzed the, I should say, compared the bending

23  steps that are necessary for on-site bending versus off-site

24  bending in your March 13th report, correct, sir?

25  A.  Yes.

1    Q.  And is it fair to say that the machine that has been

2    installed in Sayreville is a new type of bending machine?

3    A.  It is.

4    Q.  And it's what's called a double-ended bender?

5    A.  That's right.

6    Q.  And it is able to simultaneously bend both ends of the bar

7    at once?

8    A.  That's right.

9    Q.  And the on-site machines can only bend one end of the bar

10   at once, correct?

11   A.  That's correct.

12   Q.  So that a bar done on-site has to be bent twice, whereas, a

13   bar at Sayreville can be bent only once?

14   A.  Correct.

15   Q.  Now, am I right that it is more efficient economically to

16   do the bending at Sayreville where you only have to bend each

17   bar once?

18   A.  Yes.

19   Q.  And would it represent monetary savings to Navillus if they

20   were to do all of their bending through the double-ended

21   bending machine?

22   A.  There are pluses and minuses but it would probably, yes.

23   Q.  In fact, can I speculate that you've done an analysis of

24   how much money that Navillus would save if it could perform all

25   of the bending at the Sayrevile site even using three men doing

1    the double bending?

2    A.   No.

3    Q.   Would it be millions of dollars?

4    A.   I don't know.

5    Q.   Could it be million of dollars?

6    A.   I don't believe so.

7    Q.   How much do you think it would be?

8            MR. FASMAN:  Objection.  He said he didn't know, your

9    Honor.

10           THE COURT:  Objection sustained.

11           MR. KENNEDY:  Okay.

12   BY MR. KENNEDY:

13   Q.   Have you compared the man hours it takes to bend one ton of

14   rebar on-site versus the off-site double ended benders?

15   A.   I have not.

16   Q.   Did the prospect of Navillus saving money by using a more

17   efficient bending machine enter into your determination that

18   the Sayreville facility should used to cut and bend this rebar?

19   A.   Our primary focus was the safety and the schedule.

20   Q.   Well, I understand that you asserted that's your primary

21   focus.  Was there a secondary focus that recognized an economic

22   savings involved?

23   A.   Yes.

24           MR. KENNEDY:  No further questions.

25           THE COURT:  Okay.  Thank you.  Any brief redirect?

1  REDIRECT EXAMINATION

2  BY MR. FASMAN:

3  Q.  Mr. Smith, let me direct your attention to Paragraph 18 of

4  your affidavit please.  Do you see that there?

5  A.  I do.

6  Q.  The last sentence, can you tell us in your own words what

7  that sentence means, the one that begins "our schedule of

8  production has already been impacted", can you explain that for

9  the record, please?

10 A.  We have, particularly, areas where we have to install steel

11 so that we can get our concrete poured.  These are critical

12 areas to the job.  It is definitely going to delay the schedule

13 with all of the attendant costs.

14 Q.  You mentioned in response to Mr. Kennedy's questions that

15 there were pluses and minuses of doing this at Sayreville.

16 What at minuses?

17 A.  We have to rent a facility.  So we have to buy machines.

18 We have to double trucking, the trucks have to drop there and

19 then particular up and truck into the city, those sort of

20 things.

21 Q.  Okay.  When you notified the union in February how did you

22 do that?

23 A.  By letter.  E-mail.

24 Q.  Was there ever an offer made to the union to look at the

25 facility and to discuss the safety concerns with it?

1    A.   Yes.

2    Q.   Who made that offer?

3    A.   I did.

4    Q.   To whom?

5    A.   To Mr. Terrence Moore.

6    Q.   Who is Mr. Moore?

7    A.   The business manager.  It was also made to Mr. Kevin Kelly.

8    Q.   Did the union, in fact, join you in a tour of the facility?

9    A.   No.

10   Q.   Did they explain why?  Did they tell you why they didn't?

11   A.   I believe they -- the statement was they weren't

12   interested.

13           MR. FASMAN:  All right.  Thank you, your Honor.  I

14   have nothing further.

15           THE COURT:  Thank you.  Any extremely brief recross?

16           MR. KENNEDY:  No, your Honor.

17           THE COURT:  Okay.  Thank you very much.  Mr. Smith,

18   you may have a seat.

19           (Pause)

20           THE COURT:  Okay.  Thank you very much.  Any other

21   witnesses?

22           MR. FASMAN:  We have none, your Honor.

23           THE COURT:  OK.  Any witnesses by the defense?

24           MR. KENNEDY:  Could I just have a minute to consult

25   with my client, your Honor?

1          THE COURT:  Sure.

2          (Pause).

3          MR. KENNEDY:  Your Honor, Mr. Kelly's declaration is

4   also part of the record and we have nothing further to add to

5   it.

6          THE COURT:  All right.  I have Mr. Kelly's affidavit.

7   Do plaintiffs have any other witnesses?  Do plaintiffs?

8          MR. FASMAN:  We don't need to cross-examine Mr. Kelly,

9   your Honor.

10         THE COURT:  All right.  Thank you very much, counsel.

11         I find that plaintiff has not met its burden of

12  establishing irreparable harm in this case.  I do think that

13  there is, obviously, some harm.  I don't think the harm is

14  irreparable.  In light of the circumstances, in light of the

15  testimony by Mr. Smith, in light of arguments by counsel, but

16  let's move things along quickly.  Let's schedule another

17  hearing.

18         It appears -- again, the parties should and I think

19  the parties will seek out arbitration immediately.  In terms of

20  preliminary injunction hearing, I assume that there is not any

21  discovery that the parties need before having a preliminary

22  injunction hearing.

23         MR. FASMAN:  We don't need any, your Honor.

24         THE COURT:  What about defendant.

25         MR. KENNEDY:  Well, your Honor, we would need -- and

1  we would need this in the arbitration before any preliminary

2  injunction hearing the contracts that form the basis of this

3  project, meaning the Navillus contract with the PMJ or the Port

4  Authority rather and the PMC contract with Navillus and the

5  purchase orders for the machines.  Assume all that can be put

6  together pretty quickly.

7          THE COURT:  Okay I understand why you might need that

8  for the arbitration.  What is your need for that in terms of

9  the preliminary injunction hearing?

10          MR. KENNEDY:  I am not sure I do need it to be honest

11  but I think the record would be better served to have them and

12  I am assuming that's something that could be gotten by the end

13  of the day as an example.  I'm not suggesting we go through a

14  long discovery process.

15          THE COURT:  What is plaintiff's position on that?

16          MR. FASMAN:  Your Honor, we will happy to discuss that

17  with the arbitrator when we select one but I don't think it's

18  necessary for the PI hearing.

19          THE COURT:  Okay.  All right.  Let's schedule a

20  hearing.  Are counsel available on April 4th?

21          MR. KENNEDY:  I am available, judge.

22          THE COURT:  Counsel for plaintiff?

23          MR. FASMAN:  Yes, I'm available, your Honor.

24          THE COURT:  Okay.  So let's say two o'clock on April

25  4th.

1          Thank you.  Anything else from plaintiff today?

2          MR. FASMAN:  No, your Honor.

3          THE COURT:  Okay Anything else from defendant today?

4          MR. KENNEDY:  No, your Honor.

5          THE COURT:  Okay.  Thank you very much.

6                          (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25